1  WO

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                       FOR THE DISTRICT OF ARIZONA

8

9   Timothy Stuart Ring,                )    CIV 16-04070-PHX-SPL (MHB)
                                         )
10          Petitioner,                  )    **REPORT AND RECOMMENDATION**
                                         )
11  vs.                                  )
                                         )
12  Charles L. Ryan, et al.,             )
                                         )
13          Respondents.                 )
                                         )
14  _____     )

15  TO THE HONORABLE STEVEN P. LOGAN, UNITED STATES DISTRICT COURT:

16          Petitioner Timothy Stuart Ring, who is confined in the Arizona State Prison Complex,

17  Buckley Unit, in Buckeye, Arizona, has filed a pro se Petition for Writ of Habeas Corpus

18  pursuant to 28 U.S.C. § 2254 (Doc. 1). Respondents filed an Answer (Doc. 13), and

19  Petitioner has filed a Reply (Doc. 14).

20                            **BACKGROUND**

21          Petitioner was convicted following jury trial in Maricopa County Superior Court, case

22  #CR1995-001754, of first degree felony murder, conspiracy to commit armed robbery, armed

23  robbery, first degree burglary, and theft and was sentenced to death and lesser sentences. See

24  State v. Ring, 25 P.3d 1139 (Ariz. 2001). Petitioner's conviction and sentences were affirmed

25  by the Arizona Supreme Court. See id. The United States Supreme Court granted certiorari

26  and reversed and remanded regarding Petitioner's death sentence. See Ring v. Arizona, 536

27  U.S. 584 (2002). On September 5, 2003, the Arizona Supreme Court held that a finding that

28  Petitioner committed the murder for pecuniary gain was not harmless error and remanded for

resentencing. See State v. Ring, 76 P.3d 421 (Ariz. 2003). In July 2007, upon remand, the

trial court resentenced Petitioner to a natural life term of imprisonment on the murder

conviction pursuant to an agreement he entered with the State.

The Arizona Supreme Court described the facts of this case as follows:

¶2 At approximately 2:00 p.m. on November 28, 1994, a Wells Fargo armored van servicing Dillard's department store at Arrowhead Mall was reported missing by Dave Moss, the van's "hopper." At approximately 6:30 p.m. that same day, a Maricopa County Sheriff's deputy discovered the missing van in the parking lot of a Sun City church. All of the van's doors were locked, the engine was running, and a body was slumped over on the passenger side. The body was that of the van's driver, John Magoch, who had been killed by a gunshot wound to the head.

¶3 Wells Fargo determined that its losses from the robbery totaled $833,798.12, of which $562,877.91 was in cash. Although no eyewitnesses to the crime came forward, one person riding his bicycle in Sun City on the afternoon of the robbery claimed to have seen a white van, followed by a red pick-up truck, run a stop sign. This witness stated that one man was driving the red truck while two people were in the van. Another witness also saw a white van followed by a red pick-up truck. Although she remembered one man driving the van, she testified that either two or three men were in the red truck.

¶4 Through information provided by an informant, the Glendale Police Department contacted Judy Espinoza, who believed that her boyfriend James Greenham and a friend of Greenham's named "Tim" may have been involved in the robbery. "Tim" later turned out to be Defendant—Timothy Ring. Glendale Police interviewed Espinoza on December 30, 1994. Espinoza stated that when she heard about the robbery on the radio, she remembered that a week before Greenham had asked her what she would do "if he hit an Armored car." Espinoza also remembered that, although Greenham had been staying with her, he was not at home on the night of the robbery and during that week he was "very stressed out." In addition, shortly after the robbery, Greenham handed Espinoza a bag of rolled coins totaling approximately $250 and gave Espinoza's mother $800 in cash to pay bills. Finally, Espinoza informed the police that Greenham's friend Tim owned a red truck. About a week before the interview with police, Greenham had stopped dating Espinoza and had moved out of her home.

¶5 While conducting surveillance of Greenham, the police noticed that he appeared to be riding a new motorcycle. Random phone calls to motorcycle dealerships revealed that, in December 1994, Greenham and Defendant made large cash purchases at Metro Motor Sports. Specifically, Defendant bought two ATVs and a motorcycle from the dealership for $7,500 and $7,300, respectively. Over the next several weeks, Defendant and Greenham both made many more expensive purchases, all of them cash transactions. Wiretaps on certain telephones belonging to Defendant and Greenham began on January 9, 1995. On January 21, 1995, Defendant called William Ferguson and discussed Greenham's purchase of a new truck, the trouble this caused with Greenham's ex-wife, and what impact that trouble might have on their plans "up north." In that call, Defendant threatened to "cut off" Greenham's supply, as Defendant held "both his and mine." The two also talked about disappearing

- 2 -

for two years after "up north happens," then reuniting in Las Vegas. Four days later, Ferguson bought a new motorcycle for $8,700 cash, paying in fifty and one-hundred dollar bills.

¶6 On January 26, 1995, Greenham called Defendant's pager and entered the following code: 20*2000*04. He followed that call with another code: 50*5000*04. In conversations between Defendant and Ferguson, Defendant had referred to Greenham as "zero four." Later that day, Defendant asked Greenham, "The two pages you sent ... those are your requests, is that right?" To which Greenham responded, "Yeah."

¶7 As part of the investigation of Defendant, arrangements were made with Waste Management Company to perform a "trash cover," enabling investigators to sort through and survey Defendant's waste. During this process, police acquired two notecards, written by Defendant, with addresses of businesses serviced by Loomis Armored Cars, as well as numbers corresponding to Loomis trucks. Defendant was employed by Loomis in 1988–89 and, at trial, claimed that the notecards pertained to his employment at that time.

¶8 The police then attempted to generate discussion between the conspirators about the robbery. On January 31, 1995, the police issued a news release that was aired on local television stations. Defendant called Greenham at approximately 10:30 that evening and left a message on Greenham's answering machine to "remind me to talk to you tomorrow and tell you what was on the news tonight. Very important, and also fairly good." A few days later, Detective Tom Clayton from the Glendale Police Department left his business card on the door of Greenham's residence, requesting that Greenham call and "refer to lead 176." In response, Greenham made an emotional, panicked telephone call to Defendant. Greenham also apparently called his ex-wife, who was so concerned about his well-being that she asked Phoenix Police to visit Greenham's apartment to check on him. Coincidentally, Defendant stopped by Greenham's apartment at the same time. Defendant later discussed this incident with Ferguson, telling him "I don't know what to think of it. Uhm, his house is clean. Mine, on the other hand, contains a very large bag." Later that same day, Defendant also said, "it doesn't really make a whole lot of sense, because given the information that they do have, both public and what I've been able to ascertain privately ... if they were gonna come after somebody, it would be me." Ferguson ended the call by saying that he would "keep a suitcase packed."

¶9 On February 14, 1995, the police again attempted to generate conversation by airing a "Silent Witness" re-enactment on the local news that contained several deliberately incorrect details about the robbery and murder. Defendant called Ferguson at 10:51 p.m. to talk about the broadcast. Ferguson claimed to have "laughed my ass off" and said he was "not real worried at all now." Defendant stated that "there's only one thing that slightly concerns me," and asked, "What if push comes to shove down the months and they ask for hair and fibers, so forth, and it happens to somehow...." Later in the conversation, Defendant said, "there was a couple of in continuities (sic) to their story.... They showed a suppressed revolver of all things."

¶10 Two days later, on February 16, 1995, a search warrant was served on Defendant's residence. Police found a homemade sound suppressor attached to a Ruger 1022 rifle barrel behind the hot water heater in a corner of

Defendant's garage. Also in the garage, inside a storage cabinet, police discovered a green duffel bag with Defendant's name on it. The bag contained bundles of United States currency totaling $271,681. Defendant also had $1,040 in a headboard in the master bedroom. In a notebook found in the same headboard, police discovered a post-it note that had the number "575,995" on it. Below the number was the word "splits," with the three letters "F," "Y," and "T," and numbers below the letters totaling 575,995, which is remarkably similar to the total cash amount taken in the robbery. An expert testified that this note was written by Defendant. Greenham's friends often called him "Yoda"; thus, argued the state, the "Y" represented Greenham, the "F" was for Ferguson, and the "T" stood for Defendant. A search warrant served on Ferguson's residence also turned up $62,601. Approximately $200 was found at Greenham's apartment.

¶11 In his own defense, Defendant claimed to have made more than $100,000 as a confidential informant for the FBI. However, an agent for that agency testified that Defendant was only paid a total of $458. In addition, Defendant testified that his income included money made as a bounty hunter and gunsmith. However, Defendant only made $3,500 working for Don's Bail Bonds in 1993 and while working one month for A–1 Bail Bonds in 1994 was paid $1,600.

Ring, 25 P.3d at 1142-44, ¶¶ 2-11 (Ariz. 2001) (footnotes and internal citations omitted).

Petitioner filed a notice of post-conviction relief (PCR) in September 2007. (Exh. E.) Petitioner's PCR petition raised two theories for relief, but alleged multiple claims under each theory: ineffective assistance of counsel and prosecutorial misconduct. (Exhs. F, I.) The trial court dismissed some of the claims finding them not colorable. (Exh. F.) The court ordered an evidentiary hearing on Petitioner's remaining claims. (Exh. F.) After an evidentiary hearing, the court denied the remaining claims, and dismissed the petition. (Exh. G.) Petitioner filed a petition for review of the dismissal of his PCR petition with the Arizona Court of Appeals. (Exh. B, K.) The appellate court granted review, but denied relief. (Exh. B.) The Arizona Supreme Court denied Petitioner's petition for review. (Exh. H.)

Petitioner has filed a 471-page habeas petition with 435 pages of accompanying exhibits. Petitioner names Charles L. Ryan as Respondent and the Arizona Attorney General as an additional Respondent. Petitioner raises seven grounds for relief. In Ground One, Petitioner alleges violation of his Fourth, Fifth, and Fourteenth Amendment rights, and federal statutory law, in connection with wiretap orders. (Doc. 1 at 6.) In Ground Two, Petitioner alleges that his Fifth, Sixth, and Fourteenth Amendment rights were violated when he was denied the right to present a third party defense. (Doc. 1-1 at 1.) In Ground Three, he

alleges that his Fifth and Fourteenth Amendment rights were violated based upon insufficient evidence. (Doc. 1-2 at 1.) In Ground Four, Petitioner alleges that his Fifth and Fourteenth Amendment rights were violated where the post-conviction review court precluded newly-discovered ballistics evidence. (Doc. 1-3 at 1.) In Ground Five, he alleges prosecutorial misconduct in violation of his Fifth and Fourteenth Amendment rights. (Doc. 1-5 at 1.). In Ground Six, Petitioner alleges that he was denied the effective assistance of counsel in violation of his Sixth Amendment rights. (Doc. 1-10 at 1.) In Ground Seven, Petitioner alleges that he was denied the effective assistance of counsel during post-conviction proceedings in violation of his Sixth and Fourteenth Amendment rights. (Doc. 1-12 at 1.)

In their Answer, Respondents argue: (1) Grounds One and Three are procedurally defaulted; (2) Grounds Two, Four, and Seven fail to state a cognizable claim; and (3) Petitioner's remaining claims fail on the merits.

## DISCUSSION

**A.    Standards of Review**

       **1.    Exhaustion and Procedural Default**

A state prisoner must exhaust his remedies in state court before petitioning for a writ of habeas corpus in federal court. See 28 U.S.C. § 2254(b)(1) and (c); Duncan v. Henry, 513 U.S. 364, 365-66 (1995); McQueary v. Blodgett, 924 F.2d 829, 833 (9th Cir. 1991). To properly exhaust state remedies, a petitioner must fairly present his claims to the state's highest court in a procedurally appropriate manner. See O'Sullivan v. Boerckel, 526 U.S. 838, 839-46 (1999). In Arizona, a petitioner must fairly present his claims to the Arizona Court of Appeals by properly pursuing them through the state's direct appeal process or through appropriate post-conviction relief. See Swoopes v. Sublett, 196 F.3d 1008, 1010 (9th Cir. 1999); Roettgen v. Copeland, 33 F.3d 36, 38 (9th Cir. 1994).

Proper exhaustion requires a petitioner to have "fairly presented" to the state courts the exact federal claim he raises on habeas by describing the operative facts and federal legal theory upon which the claim is based. See, e.g., Picard v. Connor, 404 U.S. 270, 275-78

(1971) ("[W]e have required a state prisoner to present the state courts with the same claim he urges upon the federal courts."). A claim is only "fairly presented" to the state courts when a petitioner has "alert[ed] the state courts to the fact that [he] was asserting a claim under the United States Constitution." Shumway v. Payne, 223 F.3d 982, 987 (9th Cir. 2000) (quotations omitted); see Johnson v. Zenon, 88 F.3d 828, 830 (9th Cir. 1996) ("If a petitioner fails to alert the state court to the fact that he is raising a federal constitutional claim, his federal claim is unexhausted regardless of its similarity to the issues raised in state court.").

A "general appeal to a constitutional guarantee," such as due process, is insufficient to achieve fair presentation. Shumway, 223 F.3d at 987 (quoting Gray v. Netherland, 518 U.S. 152, 163 (1996)); see Castillo v. McFadden, 399 F.3d 993, 1003 (9th Cir. 2005) ("Exhaustion demands more than drive-by citation, detached from any articulation of an underlying federal legal theory."). Similarly, a federal claim is not exhausted merely because its factual basis was presented to the state courts on state law grounds – a "mere similarity between a claim of state and federal error is insufficient to establish exhaustion." Shumway, 223 F.3d at 988 (quotations omitted); see Picard, 404 U.S. at 275-77.

Even when a claim's federal basis is "self-evident," or the claim would have been decided on the same considerations under state or federal law, a petitioner must still present the federal claim to the state courts explicitly, "either by citing federal law or the decisions of federal courts." Lyons v. Crawford, 232 F.3d 666, 668 (9th Cir. 2000) (quotations omitted), amended by 247 F.3d 904 (9th Cir. 2001); see Baldwin v. Reese, 541 U.S. 27, 32 (2004) (claim not fairly presented when state court "must read beyond a petition or a brief ... that does not alert it to the presence of a federal claim" to discover implicit federal claim).

Additionally, a federal habeas court generally may not review a claim if the state court's denial of relief rests upon an independent and adequate state ground. See Coleman v. Thompson, 501 U.S. 722, 731-32 (1991). The United States Supreme Court has explained:

> In the habeas context, the application of the independent and adequate state ground doctrine is grounded in concerns of comity and federalism. Without the rule, a federal district court would be able to do in habeas what this Court could not do on direct review; habeas would offer state prisoners whose custody was supported by independent and adequate state grounds an end run

around the limits of this Court's jurisdiction and a means to undermine the State's interest in enforcing its laws.

Id. at 730-31. A petitioner who fails to follow a state's procedural requirements for presenting a valid claim deprives the state court of an opportunity to address the claim in much the same manner as a petitioner who fails to exhaust his state remedies. Thus, in order to prevent a petitioner from subverting the exhaustion requirement by failing to follow state procedures, a claim not presented to the state courts in a procedurally correct manner is deemed procedurally defaulted, and is generally barred from habeas relief. See id. at 731-32.

Claims may be procedurally barred from federal habeas review based upon a variety of factual circumstances. If a state court expressly applied a procedural bar when a petitioner attempted to raise the claim in state court, and that state procedural bar is both "independent"[1] and "adequate"[2] – review of the merits of the claim by a federal habeas court is ordinarily barred. See Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991) ("When a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court.") (citing Wainwright v. Sykes, 433 U.S. 72, 87-88 (1977) and Murray v. Carrier, 477 U.S. 478, 485-492 (1986)).

Moreover, if a state court applies a procedural bar, but goes on to alternatively address the merits of the federal claim, the claim is still barred from federal review. See Harris v. Reed, 489 U.S. 255, 264 n.10 (1989) ("[A] state court need not fear reaching the merits of a federal claim in an *alternative* holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law. ... In this way, a state court may reach a federal question without sacrificing its interests in finality, federalism, and comity.") (citations omitted); Bennett v. Mueller, 322 F.3d 573, 580

---

[1] A state procedural default rule is "independent" if it does not depend upon a federal constitutional ruling on the merits. See Stewart v. Smith, 536 U.S. 856, 860 (2002).

[2] A state procedural default rule is "adequate" if it is "strictly or regularly followed." Johnson v. Mississippi, 486 U.S. 578, 587 (1988) (quoting Hathorn v. Lovorn, 457 U.S. 255, 262-53 (1982)).

- 7 -

(9th Cir. 2003) ("A state court's application of a procedural rule is not undermined where, as here, the state court simultaneously rejects the merits of the claim.") (citing <u>Harris</u>, 489 U.S. at 264 n.10).

A procedural bar may also be applied to unexhausted claims where state procedural rules make a return to state court futile. <u>See</u> <u>Coleman</u>, 501 U.S. at 735 n.1 (claims are barred from habeas review when not first raised before state courts and those courts "would now find the claims procedurally barred"); <u>Franklin v. Johnson</u>, 290 F.3d 1223, 1230-31 (9th Cir. 2002) ("[T]he procedural default rule barring consideration of a federal claim 'applies only when a state court has been presented with the federal claim,' but declined to reach the issue for procedural reasons, or 'if it is clear that the state court would hold the claim procedurally barred.'") (quoting <u>Harris</u>, 489 U.S. at 263 n.9).

Specifically, in Arizona, claims not previously presented to the state courts via either direct appeal or collateral review are generally barred from federal review because an attempt to return to state court to present them is futile unless the claims fit in a narrow category of claims for which a successive petition is permitted. <u>See</u> Ariz.R.Crim.P. 32.1(d)-(h), 32.2(a) (precluding claims not raised on appeal or in prior petitions for post-conviction relief), 32.4(a) (time bar), 32.9(c) (petition for review must be filed within thirty days of trial court's decision). Arizona courts have consistently applied Arizona's procedural rules to bar further review of claims that were not raised on direct appeal or in prior Rule 32 post-conviction proceedings. <u>See, e.g.,</u> <u>Stewart</u>, 536 U.S. at 860 (determinations made under Arizona's procedural default rule are "independent" of federal law); <u>Smith v. Stewart</u>, 241 F.3d 1191, 1195 n.2 (9th Cir. 2001) ("We have held that Arizona's procedural default rule is regularly followed ["adequate"] in several cases.") (citations omitted), <u>reversed on other grounds</u>, <u>Stewart v. Smith</u>, 536 U.S. 856 (2002); <u>see also</u> <u>Ortiz v. Stewart</u>, 149 F.3d 923, 931-32 (9th Cir. 1998) (rejecting argument that Arizona courts have not "strictly or regularly followed" Rule 32 of the Arizona Rules of Criminal Procedure); <u>State v. Mata</u>, 185 Ariz. 319, 334-36, 916 P.2d 1035, 1050-52 (Ariz. 1996) (waiver and preclusion rules strictly applied in post-conviction proceedings).

Because the doctrine of procedural default is based on comity, not jurisdiction, federal courts retain the power to consider the merits of procedurally defaulted claims. See Reed v. Ross, 468 U.S. 1, 9 (1984). The federal court will not consider the merits of a procedurally defaulted claim unless a petitioner can demonstrate that a miscarriage of justice would result, or establish cause for his noncompliance and actual prejudice. See Schlup v. Delo, 513 U.S. 298, 321 (1995); Coleman, 501 U.S. at 750-51; Murray, 477 U.S. at 495-96. Pursuant to the "cause and prejudice" test, a petitioner must point to some external cause that prevented him from following the procedural rules of the state court and fairly presenting his claim. "A showing of cause must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded [the prisoner's] efforts to comply with the State's procedural rule. Thus, cause is an external impediment such as government interference or reasonable unavailability of a claim's factual basis." Robinson v. Ignacio, 360 F.3d 1044, 1052 (9th Cir. 2004) (citations and internal quotations omitted). Ignorance of the State's procedural rules or other forms of general inadvertence or lack of legal training and a petitioner's mental condition do not constitute legally cognizable "cause" for a petitioner's failure to fairly present his claim. Regarding the "miscarriage of justice," the Supreme Court has made clear that a fundamental miscarriage of justice exists when a Constitutional violation has resulted in the conviction of one who is actually innocent. See Murray, 477 U.S. at 495-96. Additionally, pursuant to 28 U.S.C. § 2254(b)(2), the court may dismiss plainly meritless claims regardless of whether the claim was properly exhausted in state court. See Rhines v. Weber, 544 U.S. 269, 277 (2005) (holding that a stay is inappropriate in federal court to allow claims to be raised in state court if they are subject to dismissal under § 2254(b)(2) as "plainly meritless").

## 2. Merits

Pursuant to the AEDPA[3], a federal court "shall not" grant habeas relief with respect to "any claim that was adjudicated on the merits in State court proceedings" unless the state

---

[3] Antiterrorism and Effective Death Penalty Act of 1996.

court decision was (1) contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court; or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000) (O'Connor, J., concurring and delivering the opinion of the Court as to the AEDPA standard of review). This standard is "difficult to meet." Harrington v. Richter, 562 U.S. 86, 102 (2011). It is also a "highly deferential standard for evaluating state court rulings, which demands that state court decisions be given the benefit of the doubt." Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam) (citation and internal quotation marks omitted). "When applying these standards, the federal court should review the 'last reasoned decision' by a state court ... ." Robinson, 360 F.3d at 1055.

A state court's decision is "contrary to" clearly established precedent if (1) "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at 404-05. "A state court's decision can involve an 'unreasonable application' of Federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." Hernandez v. Small, 282 F.3d 1132, 1142 (9th Cir. 2002).

**B.      Grounds One and Three**

In Ground One, Petitioner alleges a violation of his Fourth, Fifth, and Fourteenth Amendment rights, as well as, federal statutory law, in connection with wiretap orders. (Doc. 1 at 6.) Specifically, Petitioner contends that the "State obtained multiple wiretap orders through the use of police and FBI perjury, before any other traditional investigative techniques were attempted, in violation of U.S. Title III (Wiretap Act), federal law, and due process under the 5th and 14th Amendments, as well as the 4th Amendment of the U.S. Constitution."

In Ground Three, Petitioner alleges that his Fifth and Fourteenth Amendment rights were violated based upon insufficient evidence. (Doc. 1-2 at 1.) Petitioner claims that his "convictions and death sentence were upheld through accomplice liability despite a fundamental insufficiency of evidence of [Petitioner] or either of [Petitioner's] codefendants being placed at the crime scene, in violation of due process under the 5th and 14th Amendments of the U.S. Constitution, and established federal law."

Petitioner failed to fairly present the claims alleged in Grounds One and Three to the state courts. Indeed, Petitioner did not allege, and the state courts did not construe or consider, any allegations regarding violations of Petitioner's Fourth, Fifth, and Fourteenth Amendment rights, as well as, federal statutory law, in connection with wiretap orders, or allegations regarding violations of Petitioner's Fifth and Fourteenth Amendment rights due to insufficient evidence. (Exhs. I (PCR Petition), F (Minute Entry), G (Minute Entry), K (Petition for Review), B (Memorandum Decision).); see State v. Ring, 25 P.3d 1139 (Ariz. 2001). Failure to fairly present Grounds One and Three has resulted in procedural default because Petitioner is now barred from returning to state courts. See Ariz.R.Crim.P. 32.2(a), 32.4(a).

Although a procedural default may be overcome upon a showing of cause and prejudice or a fundamental miscarriage of justice, see Coleman, 501 U.S. at 750-51, Petitioner has not established that any exception to procedural default applies. And, Petitioner's status as an inmate, lack of legal knowledge and assistance, and limited legal resources do not establish cause to excuse the procedural bar. See Hughes v. Idaho State Bd. of Corr., 800 F.2d 905, 909 (9th Cir. 1986) (an illiterate pro se petitioner's lack of legal assistance did not amount to cause to excuse a procedural default); Tacho v. Martinez, 862 F.2d 1376, 1381 (9th Cir. 1988) (petitioner's reliance upon jailhouse lawyers did not constitute cause). Accordingly, Petitioner has not shown cause for his procedural default.

Petitioner has also not established a fundamental miscarriage of justice. A federal court may review the merits of a procedurally defaulted claim if the petitioner demonstrates that failure to consider the merits of that claim will result in a "fundamental miscarriage of

justice." <u>Schlup</u>, 513 U.S. at 327. The standard for establishing a <u>Schlup</u> procedural gateway claim is "demanding." <u>House v. Bell</u>, 547 U.S. 518, 538 (2006). The petitioner must present "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial." <u>Schlup</u>, 513 U.S. at 316. Under <u>Schlup</u>, to overcome the procedural hurdle created by failing to properly present his claims to the state courts, a petitioner "must demonstrate that the constitutional violations he alleges ha[ve] probably resulted in the conviction of one who is actually innocent, such that a federal court's refusal to hear the defaulted claims would be a 'miscarriage of justice.'" <u>House</u>, 547 U.S. at 555-56 (quoting <u>Schlup</u>, 513 at 326, 327). To meet this standard, a petitioner must present "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - that was not presented at trial." <u>Schlup</u>, 513 U.S. at 324. The petitioner has the burden of demonstrating that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." <u>Id.</u> at 327. Petitioner has failed to establish, let alone allege, a sufficient showing of actual innocence to establish a miscarriage of justice. Therefore, Petitioner cannot excuse his procedural defaults on this basis.

**C.      Grounds Two, Four, and Seven**

In Ground Two, Petitioner alleges that his Fifth, Sixth, and Fourteenth Amendment rights were violated when he "was denied the right to present a third party defense." (Doc. 1-1 at 1.) Although the specifics of Petitioner's claim are difficult to pin down, Petitioner appears to argue that the trial court erred by prohibiting the introduction of third-party culpability evidence.

In Ground Four, Petitioner alleges that his Fifth and Fourteenth Amendment rights were violated where the post-conviction review court "improperly precluded newly discovered ballistics evidence that undermines [Petitioner's] felony murder conviction." (Doc. 1-3 at 1.)

In Ground Seven, Petitioner alleges that he was denied the effective assistance of counsel during post-conviction proceedings in violation of his Sixth and Fourteenth Amendment rights. (Doc. 1-12 at 1.)

As to Grounds Two and Four, the Court can grant habeas relief "only on the ground that [a petitioner] is in custody in violation of the Constitution or laws or treatises of the United States." 28 U.S.C. § 2254(a). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law grounds." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); see Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993) ("[M]ere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal habeas."); Lewis v. Jeffers, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."). And, a petitioner may not "transform a state law issue into a federal one merely by asserting a violation of due process." Poland v. Stewart, 169 F.3d 573, 584 (9th Cir. 1999) (quoting Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996)); see Engle v. Isaac, 456 U.S. 107, 119-21 (1982) ("While they attempt to cast their first claim in constitutional terms, we believe that this claim does no more than suggest that the instructions at respondents' trials may have violated state law.").

Petitioner does not present a cognizable federal claim in Ground Two. Although Petitioner attempts to transform his attack on a state court evidentiary ruling as a constitutional denial of his right to present a meaningful defense, he cannot transform this state law issue into a federal one merely by asserting a constitutional violation. See, e.g., Poland, 169 F.3d at 584. This alleged violation of state law is not a claim that is cognizable on federal habeas review.

Similarly, Petitioner also fails to assert a cognizable federal claim in Ground Four. Again, whether a state evidentiary ruling is correct or not does not constitute a claim cognizable on federal habeas review. Further, to the extent Petitioner is challenging the state post-conviction court's ruling on alleged "newly discovered ballistics evidence," that claim is also not cognizable. Unless the collateral review of a petitioner's conviction violated some independent constitutional right, an alleged error in the state collateral proceeding cannot form the basis for federal habeas corpus relief. See, e.g., Franzen v. Brinkman, 877 F.2d 26, 26 (9th Cir. 1989); Montgomery v. Meloy, 90 F.3d 1200, 1206 (7th Cir. 1996). See also Sellers v. Ward, 135 F.3d 1333, 1339 (10th Cir. 1998) (finding that even constitutional error alleged

to have occurred in a state post-conviction proceeding would not provide a basis for federal habeas relief). Ground Four is not cognizable on federal habeas review.

As to Ground Seven, Petitioner's claims based on an entitlement to post-conviction counsel under Arizona law are not cognizable on federal habeas corpus review. See Ortiz, 149 F.3d at 939 (an alleged violation of Ariz.R.Crim.P. 32.4(c) based on the trial court's failure to appoint the petitioner counsel in a post-conviction proceeding was not cognizable on federal habeas corpus review). A criminal defendant has no federal constitutional right to counsel in state post-conviction proceedings. See Pennsylvania v. Finley, 481 U.S. 551, 555 (1987). Absent such a right, "a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." Coleman, 501 U.S. at 752.

The courts in the District of Arizona recognize that a defendant has a right to the assistance of counsel in a Rule 32 of-right proceeding in Arizona, because the of-right proceeding is a form of direct review. See Summers v. Schriro, 481 F.3d 710, 717-18 (9th Cir. 2007). Here, however, Petitioner did not plead guilty and, thus, Petitioner's post-conviction proceeding was not an of-right proceeding. Accordingly, Petitioner did not have a right to counsel in that proceeding.

**D.     Ground Five**

In Ground Five, Petitioner alleges prosecutorial misconduct in violation of his Fifth and Fourteenth Amendment rights. (Doc. 1-5 at 1.) Petitioner contends that the "State engaged in egregious intentional misconduct to deny [Petitioner] a fair trial, which included perjury, witness tampering, evidence tampering, and violations of Brady and the rules of discovery, in violation of federal law and the 5th, 6th, and 14th Amendments of the United States Constitution."

In his 187-page statement supporting his claim of prosecutorial misconduct, Petitioner asserts a litany of facts and conclusory assertions that are difficult to discern. In the last reasoned decision addressing Petitioner's prosecutorial misconduct claim based on violations of Brady v. Maryland as set forth in his Petition for Review, the Arizona Court of Appeals analyzed Petitioner's claim that "the state had failed to disclose evidence regarding the

relationship between the [Maricopa County Attorney's Office] and [Michael] Sanders, which would have supported [Petitioner's] third-party culpability defense and established the nexus the trial court had stated was missing before trial." (Exh. B at 5.) The appellate court also discussed Petitioner's claim of "misconduct and *Brady* violations related to the FBI's failure to disclose information that would have supported his defense that he had been paid by the FBI to abduct individuals in Mexico."[4] (Exh. B at 6.)

Under Brady v. Maryland, 373 U.S. 83 (1963), the government has a constitutional obligation to disclose material, favorable information to the defense. Brady is violated where (1) the evidence in question was favorable to the accused, (2) the government willfully or inadvertently suppressed the evidence, and (3) prejudice resulted from the suppression (i.e., the evidence was "material"). See Strickler v. Greene, 527 U.S. 263, 281-82 (1999); Banks v. Dretke, 540 U.S. 668, 691 (2004). Evidence is material for Brady purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles v. Whitley, 514 U.S. 419, 433 (1995) (quoting United States v. Bagley, 473 U.S. 667, 682 (1982)). "In other words, favorable evidence is subject to constitutionally mandated disclosure when it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" Cone v. Bell, 556 U.S. 449, 470 (2009) (quoting Kyles, 514 U.S. at 435). The duty to disclose includes impeachment as well as exculpatory material. See Bagley, 473 U.S. at 676.

"The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." United States v. Agurs, 427 U.S. 97, 109-10 (1976); see

---

[4] To the extent any additional claims of prosecutorial misconduct could possibly be construed in Ground Five, those claims which Petitioner never raised in the state courts, as well as those claims which Petitioner may have raised in the state trial court, but failed to raise in his Petition for Review and were not considered by court of appeals, have not been fairly presented. Failure to fairly present any additional claims has resulted in procedural default because Petitioner is now barred from returning to state courts. See Ariz.R.Crim.P. 32.2(a), 32.4(a). And, Petitioner has not shown, much less alleged, cause for his procedural default or established a fundamental miscarriage of justice.

Runningeagle v. Ryan, 686 F.3d 758, 769 (9th Cir. 2012); Barker v. Fleming, 423 F.3d 1085, 1099 (9th Cir. 2005); Downs v. Hoyt, 232 F.3d 1031, 1037 (9th Cir. 2000) (rejecting a Brady claim in part because the petitioner's arguments were speculative); United States v. Abonce-Barrera, 257 F.3d 959, 970 (9th Cir. 2001) (finding that evidence was not material under Brady where the defendant had only "a hunch" that the evidence would be useful).

**1.    Non-disclosure of evidence regarding the relationship between the Maricopa County Attorney's Office and Michael Sanders**

The Court will first address Petitioner's claim that "the state had failed to disclose evidence regarding the relationship between the [Maricopa County Attorney's Office] and [Michael] Sanders," who was an informant for the Maricopa County Attorney's Office and admitted to Glendale police officers that he had helped plan the robbery, but insisted that he had been "cut out of the plan, and not participated in committing it." (Exh. B at 4.) Petitioner raised this claim in his PCR petition and the trial court found that Petitioner had raised a "colorable claim warranting an evidentiary hearing." (Exh. B at 5.) Following that hearing, the trial court denied relief "summarizing the record that already existed and entering extensive factual findings based on the evidence and testimony presented in [the] post-conviction proceeding." (Exh. B at 5.) The trial court stated, in pertinent part:

> Although Clark was not aware of Sanders['] status as a paid informant in the years 1986-1988[], prior to trial Clark had plenty of information about Sanders and his involvement in the case:
> • The prosecutor disclosed Sanders as a witness based upon Sanders' statements to detectives of his, and Ring's, involvement in the case. ...
> • Clark testified at the hearing in these proceedings that prior to trial he knew Sanders had approached police to sell them information about the Arrowhead robbery and he knew that Sanders did such things often.
> • The search warrant affidavit of January 11, 1995 for Ring, Greenham, and Ferguson related that affiant Clayton received information from a confidential informant that had spoken personally to Ring and knew that Ring had conducted surveillance on armored car routes; would use a fragmenting bullet; would get the driver while he smoked; and had done an armored car robbery in Mexico. Clark testified further that not only did he suspect Sanders was the informant that had been referred to in the search warrant affidavit, Ring also told him (Clark) that Sanders was likely a snitch.
> • On September 10, 1996, Clark specifically referred to the following aspects of Sanders and his involvement in the case in argument to the trial court: (1) Sanders precisely described the details about the crime to police officers; (2) Sanders came to work at 3:30 P.M. instead of 2:30 P.M. on the day of the crime; (3) Sanders sought immunity for himself and for his brother-in-law Brian Robbins for the crime; (4) Sanders also requested immunity for the

- 16 -

PACE warehouse robbery; (5) Sanders told the police that he would have no problem killing someone; (6) the police placed a pen register device and a trap and trace device on Sanders' telephone line, maintaining them even after the arrests; and (7) Sanders was a convicted felon with a prior history of violent crimes. ...

(Exh. G at 9-10.) Then, applying the standards set forth in <u>Brady</u>, the court determined:

> The State did, indeed, fail to disclose the existence of the prior informant status of Sanders. However, there was no failure to disclose information that would have substantially undermined Sanders' testimony – Sanders did not testify. Nor was information provided by Sanders of critical significance at trial to the determination of Ring's guilt or innocence – the State's case against Ring utilized evidence developed entirely from sources independent of Sanders.

(Exh. G at 11.)

In its analysis of this claim, the trial court also addressed Petitioner's argument that if the relationship between Sanders and the Maricopa Attorney's Office would have been disclosed, the trial judge would have permitted Petitioner to raise a third party defense. The court found this issue precluded, and stated that Petitioner's argument on this point was "simply an attempt to bootstrap his argument that the trial court erred in deciding the issue of third party defense." (Exh. G at 11.) The court further found:

> There is no basis to conclude that Ring's trial judge would have permitted a third party defense if the relationship between Sanders and the Maricopa County Attorney's Office had been disclosed prior to trial. Judge Martin was the trial judge for both Ring and Ferguson. Judge Martin was aware that the Court of Appeals had found the appearance of a conflict of interest in the Ferguson case and addressed the apparent discrepancy before Ring's sentencing.
>
> In permitting Ferguson to pursue a third party defense Judge Martin found it debatable whether evidence of Sanders' statements to the police or his likeness to one of the composite sketches was real third party evidence that showed the culpability of another individual to the exclusion of Ferguson. However, Judge Martin observed that the evidence had an inherent tendency to connect Sanders with the commission of the crimes, adding that in a close case, a defendant should prevail on this issue.
>
> In addressing Ring's motion for new trial on the third party defense issue, Judge Martin reasoned that Ring's case was distinguishable from Ferguson's case. Judge Martin explained that Ring did not make "as comprehensive and thorough an offer of proof as Ferguson ... ."

(Exh. G at 11-12.) In addition, the court stated:

> there were other factors to justify permitting third party defense evidence by Ferguson and not Ring. Ferguson argued that Greenham, **Sanders and Ring** had committed the robbery. The facts could be construed in favor of

Ferguson's claim that **Sanders and Ring** were the real perpetrators because (a) there was a composite drawing resembling Sanders but no composite drawing resembled Ferguson, (b) Ring owned a red truck and a red truck had been referred to multiple times as being associated with the robbery, (c) there was a demonstrable link between Ring, Sanders and Greenham via video of the PACE robbery, (d) Sanders had made statements admitting involvement in the planning of the robbery, (e) except for the statements of admitted conspirator Sanders and admitted perpetrator Greenham, who was unavailable for trial, the evidence against Ferguson was based primarily upon interpretation of wiretapped conversations, and (f) Sanders did not provide corroborated evidence linking Ferguson to the crime but did so regarding Ring.

(Exh. G at 12) (emphasis original).

The trial court concluded, "[t]here is no reason to conclude that had Sanders' involvement as a paid informant working with the Maricopa County Attorney's Office been disclosed to the defense, the result of the trial or sentence would have been different – this Court does not believe there is a probability sufficient to undermine confidence in the outcome. Therefore, Defendant's claim for relief on this ground is denied." (Exh. G at 12.)

In his petition for review, Petitioner argued that the trial court abused its discretion in denying relief on this claim, insisting that the information the state failed to disclose violated <u>Brady</u>. He argued that the evidence was material and therefore prejudicial, undermining confidence in the verdict. The Arizona Court of Appeals disagreed stating, in pertinent part:

¶23 Like the trial court, we disapprove the state's lack of disclosure regarding Sanders. Particularly compelling was [defense counsel's] testimony at the Rule 32 evidentiary hearing about the effect this had on his ability to defend Ring, as was similar testimony by his co-counsel, Treasure VanDreumel. The court acknowledged "[t]he State did, indeed, fail to disclose the existence of the prior informant status of Sanders," and rejected its characterization of funds paid to Sanders as "reimbursement for lost wages and living expenses and not compensation."

¶24 Nevertheless, the trial court concluded the evidence the state failed to disclose

would [not] have substantially undermined Sanders' testimony—Sanders did not testify. Nor was information provided by Sanders of critical significance at trial to the determination of Ring's guilt or innocence—the State's case against Ring utilized evidence developed entirely from sources independent of Sanders.

The trial court also addressed Ring's related claim that the lack of disclosure deprived him of evidence that would have supported a third-party culpability

defense. The court stated that the claim was precluded, having been raised and rejected by our supreme court on appeal, adding that the argument in this proceeding "is simply an attempt to bootstrap his argument that the trial court erred in deciding the issue of third party defense." The court stated, in any event, the additional information would not have changed the trial court's rulings.

¶25 On review Ring argues the trial court's conclusion is erroneous. But there was sufficient evidence before the court to support the ruling and we have no basis for disturbing it.

(Exh. B at 5-6.)

Petitioner has failed to demonstrate that the state courts' adjudication of his <u>Brady</u> claim related to Michael Sanders' informant status resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. In the 187 pages he devotes to supporting his claim, Petitioner has failed to offer anything beyond a narrative of the facts coupled with speculative and conclusory allegations.

As demonstrated from the record, the state courts properly assessed Petitioner's <u>Brady</u> claim pursuant to the relevant constitutional standards ultimately finding that the failure to disclose the relationship and prior informant status of Sanders was not material, in that, there was no reasonable probability that the outcome of his trial would have been different. Among other things, the record establishes that (1) Petitioner's counsel "had plenty of information about Sanders and his involvement in the case" prior to trial; (2) there was no evidence that Maricopa County Attorney's Office extended any privileges to Sanders due to the prior relationship; (3) since Sanders did not testify there was no failure to disclose information that would have substantially undermined his testimony; and (4) the State's case against Petitioner utilized evidence developed entirely from sources independent of Sanders. The Court finds no error.

### 2. Non-disclosure of FBI files

The Court will next address Petitioner's claim of "misconduct and *Brady* violations related to the FBI's failure to disclose information that would have supported his defense that

- 19 -

he had been paid by the FBI to abduct individuals in Mexico." (Exh. B at 6.) In his PCR petition, Petitioner argued that "the joint nature of the investigation by the State authorities and the FBI was such that the FBI was subject to the control of the prosecutor and the rules of discovery and due process required information possessed by the FBI to be disclosed to him." (Exh. G at 7; Exh. B at 6.) The trial court found that this issue needed to be further developed in an evidentiary hearing. Following the hearing, the trial court denied relief "thoroughly address[ing] this claim in light of arguments and evidence presented in [Petitioner's] post-conviction proceeding, including testimony by Clark and prosecutor Alfred Fenzel, and documents obtained through a Freedom of Information Act request." (Exh. B at 6; Exh. G at 6-7.) The trial court first noted that the issue of non-disclosure of FBI files was addressed by the Arizona Supreme Court on direct appeal. (Exh. G at 6-7; Exh. B at 6.) The trial court discussed the supreme court's decision stating:

> the Arizona Supreme Court concluded that Ring "should have acted to procure the entire file instead of waiting until trial and using the alleged discrepancy to argue that the FBI was unwilling to proffer the entire file as part of a more general cover-up or conspiracy theory." In addition, the court commented, "trial testimony demonstrated that it would be unlikely that the FBI file would corroborate Defendant's claims." *Ring*, 200 Ariz. at 274, 25 P.3d at 1 146. The Arizona Supreme Court concluded that, given Agent Tanner's testimony, the "Defendant's alleged inability to access his entire FBI file did not render his trial so unfair as to require the granting of a new trial."

(Exh. G at 7.) Then, the trial court addressed Petitioner's PCR claim. The court found, as follows:

> At the hearing on post-conviction relief, Clark testified that he asked the prosecutor for information in the possession of the FBI and the prosecutor stated that he had disclosed what he had gotten from the FBI. There is no evidence that the State possessed more FBI information than was disclosed by the prosecutor. Indeed, Clark testified that he had no reason to believe that prosecutor Fenzel had the entire FBI files or that he provided false information to Clark. Clark's opinion was that prosecutor Fenzel was being misled into believing that all information had been disclosed as opposed to some having been withheld for "good reason".

> Clark testified that he attempted to subpoena the FBI files. Prosecutor Fenzel testified that Judge Ryan conducted an in camera proceeding concerning the subpoena for FBI records. Judge Ryan apparently quashed the subpoena. Judge Ryan's ruling was not appealed and his determination precludes the issue unless there was a *Brady* violation by deliberate concealment of information known by the prosecution. Furthermore, the fact that the trial judge conducted an in camera inspection/consideration of the subpoena of FBI records in which

- 20 -

the FBI opposed the subpoena, supports the conclusion that the FBI was not an agency under the control of the State.

In *State v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Supreme Court expressed agreement with the proposition in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), that evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different or that there was "a probability sufficient to undermine confidence in the outcome". *Bagley* held that whether the defendant had made "no request," a "general request," or a "specific request" for exculpatory information, under the *Strickland* formulation a reviewing court could consider any adverse effect that non-disclosure might have had on the preparation or presentation of the defendant's case.

During the pendency of this proceeding, Defendant utilized the Freedom of Information Act to obtain further information from federal agencies. Defendant was unable to obtain or produce any materially new or exculpatory information for this proceeding. The Court finds that Defendant failed to prove the existence of exculpatory evidence or that such evidence was in possession of State or federal authorities and was not disclosed; therefore, there is no reasonable probability that there was evidence available to the Defendant which would undermine the confidence in the outcome of the case.

The Court finds that Defendant has failed to meet his burden of proof and the request for relief on this ground is denied.

(Exh. G at 7-8.) In denying the same claim alleged in his Petition for Review, the Arizona Court of Appeals stated, "[b]ecause the record supports the court's ruling and Ring has not sustained his burden of establishing the court abused its discretion, we adopt this portion of the ruling." (Exh. B at 6.)

Here too, Petitioner has failed to demonstrate that the state courts' resolution of his Brady claim related to the FBI's alleged failure to disclose information resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. Again, Petitioner has failed to offer anything beyond his conclusory allegations and recitation of facts.

The record of the state court proceedings demonstrates a proper assessment of Petitioner's Brady claim finding that Petitioner failed to establish the existence of any exculpatory evidence, or that the State or federal agencies had any evidence that was not disclosed. And, thus, Petitioner has failed to demonstrate that there was any undisclosed

material evidence that, if the evidence had been disclosed, there was a reasonable probability that the outcome of his trial would have been different or that confidence in the verdict would have been undermined. The Court, again, finds no error.

**E.    Ground Six**

In Ground Six, Petitioner alleges that he was denied the effective assistance of counsel in violation of his Sixth Amendment rights. (Doc. 1-10 at 1.) In the 74 pages supporting his claim, Petitioner recites a narrative of facts and conclusory allegations claiming that defense counsel was ineffective in almost every aspect of his performance. Petitioner's broad allegations are vague and unsupported, making it difficult for the Court to identify and meaningfully address any sub-claims alleged therein. And, Petitioner fails to delineate any of the sub-claims he raises under Ground Six. The Court will, however, address the following six claims, which were also raised in his Petition for Review to the Arizona Court of Appeals: (1) trial counsel was ineffective for failing to obtain and present ballistics and stippling evidence; (2) trial counsel was ineffective for failing to challenge grand jury proceedings; (3) trial counsel was ineffective for informing the jury during opening statement that cross-border abductions are illegal, and failing to investigate and provide expert testimony to support Petitioner's defense; (4) trial counsel was ineffective with respect to the wiretap tapes; (5) trial counsel was ineffective based on the stun belt Petitioner was compelled to wear during trial; and (6) trial counsel was ineffective for failing to request a second-degree murder instruction and failing to object to consecutive sentences.

To establish a claim of ineffective assistance of counsel a petitioner must demonstrate that counsel's performance was deficient under prevailing professional standards, and that he suffered prejudice as a result of that deficient performance. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984). To establish deficient performance, a petitioner must show "that counsel's representation fell below an objective standard of reasonableness." Id. at 699. A petitioner's allegations and supporting evidence must withstand the court's "highly deferential" scrutiny of counsel's performance, and overcome the "strong presumption" that counsel "rendered adequate assistance and made all significant decisions in the exercise of

reasonable professional judgment." Id. at 689-90. A petitioner bears the burden of showing that counsel's assistance was "neither reasonable nor the result of sound trial strategy," Murtishaw v. Woodford, 255 F.3d 926, 939 (9th Cir. 2001), and actions by counsel that "'might be considered sound trial strategy'" do not constitute ineffective assistance. Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

To establish prejudice, a petitioner must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A "reasonable probability" is one "sufficient to undermine confidence in the outcome." Id. Courts should not presume prejudice. See Jackson v. Calderon, 211 F.3d 1148, 1155 (9th Cir. 2000). Rather, a petitioner must affirmatively prove actual prejudice, and the possibility that a petitioner suffered prejudice is insufficient to establish Strickland's prejudice prong. See Cooper v. Calderon, 255 F.3d 1104, 1109 (9th Cir. 2001) ("[A petitioner] must 'affirmatively prove prejudice.' ... This requires showing more than the possibility that he was prejudiced by counsel's errors; he must demonstrate that the errors actually prejudiced him.") (quoting Strickland, 466 U.S. at 693). However, the court need not determine whether counsel's performance was deficient if the court can reject the claim of ineffectiveness based on the lack of prejudice. See Jackson, 211 F.3d at 1155 n.3 (the court may proceed directly to the prejudice prong).

### 1. Trial counsel was ineffective for failing to obtain and present ballistics and stippling evidence

Petitioner argues that his trial counsel was ineffective for failing to obtain and present ballistics and stippling evidence. In rejecting this claim as alleged in his Petition for Review to the Arizona Court of Appeals, the court stated:

> ¶7 Ring contends the trial court abused its discretion by summarily denying relief on his claim that trial counsel Greg Clark had been ineffective in failing to request testing and information regarding ballistics and gunshot residue (GSR) or stippling, which was noted in the autopsy report. Arguing he was entitled to an evidentiary hearing on this claim, Ring refers to juror affidavits, which "[t]he defense presented,"[] stating GSR testing results would have been of interest to them. Ring asserts such evidence would have refuted the state's theory of the case that Ring, known for proficiency with guns and accuracy with respect to long-range shots, was the shooter, establishing instead that the victim had been shot at close range. Ring maintains this type of evidence also

- 23 -

would have refuted the statements of Ring's co-defendant James Greenham, who testified only during the sentencing phase of trial, that Ring had shot the victim from a distance. He also argues the evidence would have suggested the shooting had taken place somewhere other than the known crime scene, because there was no evidence anyone had approached the victim, giving that person an opportunity to shoot the victim at close range. And there was no evidence placing Ring at any other possible locations.

¶8 The trial court determined Ring had not raised a colorable claim that Clark's performance had been deficient or prejudicial. The court relied, in part, on our supreme court's comment in *Ring*, 200 Ariz. 267, ¶ 48, 25 P.3d at 1152, that the jury found him guilty of murder based on felony murder, not premediated murder, possibly signifying jurors did not believe Ring had participated in, planned, "or even expect[ed] the killing." Thus, the court implicitly found it would have made no difference if Ring was the shooter or an accomplice, given the evidence that was presented at trial and the verdict. The court stated any effect such evidence might have had on the sentence made no difference, given that the original sentence was vacated.

¶9 The trial court's ruling appears to be related specifically to the effect this testimony might have had on the sentence, presumably because Greenham testified only at sentencing, not trial. Nevertheless, we infer from the denial of relief on this claim that the court was addressing the claim as presented, which was that the absence of this evidence affected the proceedings as a whole. In any event, to the extent the court failed to address this claim more broadly, any complaint in this regard was waived. The court held a hearing on April 11, 2012, after distributing its ruling as a draft, and asked counsel to specify if it had failed to address or mischaracterized any claim that Ring had raised. Ring never challenged the ruling on this claim as being too restrictive.

¶10 Even assuming the trial court considered the jurors' affidavits and the claim as it related to the convictions, Ring's arguments are based on speculation about what might have occurred at trial and possibly could occur during a retrial, such as the impeachment of Greenham if he testified. *See State v. Meeker*, 143 Ariz. 256, 264, 693 P.2d 911, 919 (1984) ("Proof of ineffectiveness must be a demonstrable reality rather than a matter of speculation."). Furthermore, in view of the jury's verdict specifying the murder conviction was based on felony murder and the guilty verdicts on the remaining offenses, Ring has not established there is a reasonable probability the outcome would have been different if Clark had obtained and presented this evidence. *See Strickland*, 466 U.S. at 694.

(Exh. B at 2-3, ¶¶ 7-10.)

Petitioner has failed to demonstrate deficient performance and resulting prejudice as his claim relies on unsupported argument as opposed to specific facts or other evidence. See Jones v. Gomez, 66 F.3d 199, 205 (9th Cir. 1995) (conclusory assertions of ineffective assistance fall far short of stating a valid claim of constitutional violation); James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) (conclusory allegations of ineffective assistance without statement of specific facts do not warrant habeas relief). As the appellate court correctly

determined, Petitioner's claim of deficient performance is entirely speculative, and there is no reasonable probability that the outcome would have been different if any ballistics and stippling evidence were obtained and presented because the jury's verdict specified that the murder conviction was based on felony murder. The Court finds that the state court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law.

**2.     Trial counsel was ineffective for failing to challenge grand jury proceedings**

Petitioner alleges that his trial counsel was ineffective for failing to challenge grand jury proceedings. The Arizona Court of Appeals found, as follows:

> ¶11 Ring next argues he was entitled to an evidentiary hearing on his claim that Clark had been ineffective in failing to challenge the grand jury proceeding on the ground that Detective Thomas Clayton allegedly had provided perjured testimony. The trial court correctly concluded that grand jury proceedings must be challenged by special action and can be challenged on appeal only if an indictment was based on perjured testimony. *See State v. Gortarez*, 141 Ariz. 254, 258, 686 P.2d 1224, 1228 (1984) (grand jury proceedings must be challenged by special actions, except when proceedings are tainted with information the state knew was based on perjured, material testimony). The issue Ring raised, however, was one of ineffective assistance of trial counsel, which can be raised only in a post-conviction proceeding. *See State v. Spreitz*, 202 Ariz. 1, ¶ 9, 39 P.3d 525, 527 (2002).
>
> ¶12 Ring has not, however, persuaded us the trial court abused its discretion. Ring has not established that counsel's failure to seek dismissal of the indictment was deficient or that such dismissal probably would have been granted. Clayton testified before the grand jury that the actual size of the bullet could not be determined because it had disintegrated. This apparently was incorrect; the bullet had exited the victim's head and was not found and, therefore, the exact caliber could not be determined. Thus, although Clayton incorrectly described the reason for law enforcement's inability to identify the caliber of the bullet, his answer to the grand juror's question about what the wound showed in relation to the caliber of the weapon was correct—it could not be determined. In light of that fact and the other evidence of Ring's participation in the robbery as an accomplice, and given the fact that the jury found him guilty of the charged offenses, the trial court either would have denied a grand jury challenge, or Ring would have been re-indicted as the verdicts demonstrate there was probable cause. Thus, even assuming arguendo Clark's performance had been deficient, it was not prejudicial, and the court did not err in denying relief on this claim summarily.

(Exh. B at 3, ¶¶ 11-12.)

Petitioner has not demonstrated deficient performance or prejudice. Not only is Petitioner's claim speculative and self-serving, but any such challenge to the grand jury

proceedings would have been meritless. See <u>Shah v. United States</u>, 878 F.2d 1156, 1162 (9th Cir. 1989) ("The failure to raise a meritless legal argument does not constitute ineffective assistance of counsel."). Although the record reflects that Clayton may have given inaccurate testimony in that he "testified before the grand jury that the actual size of the bullet could not be determined because it had disintegrated," the record reflects that the reason for law enforcement's inability to identify the caliber of the bullet was correct – it could not be determined. Thus, Petitioner has not established that counsel's failure to challenge the grand jury proceedings based on Clayton's inaccurate testimony was ineffective. Even assuming counsel's performance was deficient for failing to challenge the grand jury proceedings, Petitioner has not established prejudice. The Court finds that the state court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law.

**3. Trial counsel was ineffective for informing the jury during opening statement that cross-border abductions are illegal, and failing to investigate and provide expert testimony to support Petitioner's defense**

Petitioner contends that his trial counsel was ineffective for informing the jury during opening statement that cross-border abductions are illegal, and failing to investigate and provide expert testimony to support Petitioner's defense. The Arizona Court of Appeals rejected this claim finding:

> ¶13 One of Ring's defenses at trial was that he had been paid by the Federal Bureau of Investigations (FBI) to kidnap individuals in Mexico and return them to the United States for prosecution, thereby explaining his increased expenditures after the robbery and murder and his possession of a large amount of cash. He contends Clark undermined this defense during his opening statement at trial when he stated it was illegal for law enforcement agents to engage in such conduct, insisting Clark should have presented evidence to refute the testimony of federal agents that it was against the law for them to conduct such operations.

> ¶14 The trial court summarily denied relief on this claim, finding the agents' testimony "was not clearly wrong." The court rejected Ring's assertion that the Supreme Court held in *United States v. Alvarez–[Machain]*, 504 U.S. 655 (1992), that abductions of persons from another country is lawful. The court further found Ring had failed to support his claim with expert testimony, did not establish such evidence "was available or admissible at the time of trial," and did not otherwise show he had been paid by the FBI.

¶15 Ring contends the trial court's interpretation of *Alvarez–[Machain]* was incorrect. We disagree. The Supreme Court stated the issue in that case was "whether a criminal defendant, abducted to the United States from a nation with which it has an extradition treaty, thereby acquires a defense to the jurisdiction of this country's courts." *Alvarez–[Machain]*, 504 U.S. at 657. The Court held, "he does not, and ... he may be tried in federal district court for violations of the criminal law of the United States." *Id.* Based on the terms of the extradition treaty between Mexico and the United States and prior case law, the Court concluded that because the treaty did not expressly prohibit prosecution in this country of persons abducted from Mexico, the defendant could be prosecuted here following his abduction. *Id.* at 670. The Court observed, however, that the abduction could have violated "general international law principles," *id.* at 669, noting the Mexican government had asked the United States to extradite individuals suspected of having kidnapped the defendant, *id.* at 669 n. 16. The case does not, therefore, stand for the proposition that such abductions are lawful.

¶16 Ring's contention on review that presentation of expert testimony about *Alvarez–Machain* and cross-border kidnappings "would, in all likelihood, have made a difference in the outcome," was not only contrary to the Court's holding in that case, but speculative and unsupported as well. Ring did not establish a colorable claim that Clark's performance fell below prevailing professional norms. *See Strickland*, 466 U.S. at 687–88 (colorable claim of ineffective assistance of counsel requires showing counsel's performance was deficient and prejudicial); *Nash*, 143 Ariz. at 397-98, 694 P.2d at 227–28 (prejudice element requires showing outcome probably would have been different without deficient performance). Ring has not persuaded this court that the trial court abused its discretion in denying relief on this claim without an evidentiary hearing.

(Exh. B at 4, ¶¶ 13-16.)

Petitioner has failed to established deficient performance and prejudice. Again, Petitioner's claim relies on unsupported statements and speculation, rather than specific facts and evidence. See Jones, 66 F.3d at 205; James, 24 F.3d at 26. Further, the appellate court correctly found that Petitioner failed to demonstrate a "colorable claim that Clark's performance fell below prevailing professional norms," in that any statements made that abductions of persons from another country is lawful pursuant Alvarez–Machain, or evidence presented to refute the testimony of federal agents regarding cross-border kidnappings would have been erroneous. The Court finds that the state court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law.

**4.     Trial counsel was ineffective with respect to the wiretap tapes**

Petitioner argues that his trial counsel was ineffective with respect to the wiretap tapes. In rejecting this claim, the Arizona Court of Appeals stated:

- 27 -

¶27 Ring contends the trial court abused its discretion in denying relief after an evidentiary hearing on his claim that Clark had failed to adequately prepare for trial in a variety of respects: failing to listen to multiple, extensive tapes of wiretapped conversations, failing to compare transcripts of the conversations with the tapes, failing to play the tapes to the jury and point out the discrepancies, and failing to play certain tapes to impeach one of the state's witnesses.

¶28 Clark testified at the evidentiary hearing about his preparation, including his review of the tapes. Characterizing the court's order as "manifestly unreasonable," Ring faults the trial court for believing Clark in light of other evidence, including his own testimony and that of VanDreumel. But as we stated above, we defer to the trial court with respect to credibility determinations and will not reweigh the evidence. *Rodriguez*, 205 Ariz. 392, ¶ 18, 71 P.3d at 924. It was for the trial court, not this court, to resolve the conflicts in the testimony presented. We agree with the state that, in any event, Ring did not sustain his burden of establishing prejudice.

(Ex. B at 7, ¶¶ 27-28.) [5]

The Court finds that Petitioner has failed to demonstrate deficient performance and prejudice. "[A] federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable." Taylor v. Maddox, 366 F.3d 992, 999 (9th Cir. 2004), abrogated on other grounds, Murray v. Schriro, 745 F.3d 984, 1000 (9th Cir. 2014); see Pollard v.

---

[5] Following an evidentiary hearing, the trial court denied relief on this issue stating, in pertinent part:

Ring testified that he never heard the wiretaps or saw transcripts of them until the trial had commenced; before then he had only seen police report summaries. He testified he first heard the wiretap tapes in 2008; it took him 90 days, 8-10 hours per day, 7 days per week to get through all 400+ tapes.

VanDreumel testified that Clark was responsible for reviewing the wiretaps and she reviewed none.

Clark testified that he listened to and read transcripts of wiretaps – he asserted that one of the trial strategies was to attack the tapes as being unreliable because they were of poor quality. Clark testified that not only did he communicate with Ring about the wiretaps, he obtained notes from Ring, including notes (which numbered in the thousands of pages) about the wiretaps, and that he, Clark, still had the notes in his possession.

(Exh. G at 4.)

<u>Galaza</u>, 290 F.3d 1030, 1033, 1035 (9th Cir. 2002) (the statutory presumption of correctness applies to findings by both trial courts and appellate courts). Additionally, state court's findings of fact are presumed to be correct. <u>See</u> 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption with "clear and convincing evidence." <u>Id.</u>

"Where there are two permissible views of the evidence, a fact finder's choice between them cannot be clearly erroneous." <u>Cooper v. Brown</u>, 510 F.3d 870, 919 (9th Cir.2007) (citing <u>Amadeo v. Zant</u>, 486 U.S. 214, 226 (1988)). Petitioner has not presented any evidence, much less clear and convincing evidence, to rebut that presumption of correctness that applies to the state court's factual findings regarding Clark's testimony about the wiretaps. <u>See</u> 28 U.S.C. § 2254(e)(2). Additionally, the Court must defer to the state court's credibility determinations. <u>See</u> <u>Aiken v. Blodgett</u>, 921 F.2d 214, 217 (9th Cir. 1990). Thus, considering the state court's presumably correct findings regarding the testimony about the wiretaps, Petitioner has not shown that counsel's performance was deficient and, therefore, cannot establish a claim of ineffective assistance of counsel. Accordingly, Petitioner has not established that the state court's determination is based on an unreasonable determination of the facts, or is contrary to, or an unreasonable application of federal law.

**5.      Trial counsel was ineffective based on the stun belt Petitioner was compelled to wear during trial**

Petitioner asserts that his trial counsel was ineffective based on the stun belt Petitioner was compelled to wear during trial. The Arizona Court of Appeals rejected this claim finding:

> ¶29 The trial court denied relief on this claim after the evidentiary hearing in part because it expressly found Clark more credible than Ring. The court also found (1) there was no evidence Ring had been prejudiced in terms of what the jurors might have seen, and (2) Clark had made a tactical decision "to forego alternative security measures" that did not amount to "deficient representation." There is reasonable evidence in the record to support these findings. And again, we defer to the trial court with respect to any credibility determinations. *Rodriguez*, 205 Ariz. 392, ¶ 18, 71 P.3d at 924. We have no basis for interfering here.

(Ex. B at 7, ¶ 29 (internal footnote omitted).)[6]

---

[6] The trial court denied relief on this issue stating, in pertinent part:

Ring testified at the hearing that he wore street clothes during the trial. He testified that the stun belt was described to him as being a new type of restraint device, which might go off accidentally. He testified that the stun belt had two electrodes which made protrusions on his jacket that could be seen by jurors when he went to and from the witness stand.

There was no evidence that any juror saw the stun belt. There was no evidence that protrusions in Defendant's clothing were seen by a juror – even if the protrusions had been seen, the Court does not believe that two protrusions on Defendant's jacket, visible to the jury only when he went to and from the witness stand, can support a finding that any juror would know what a stun belt was, or that Ring was wearing a stun belt, or that any juror would draw an adverse conclusion about wearing a stun belt.

Clark was aware that Defendant was wearing a stun belt. Defendant was dressed at counsel table, he was not wearing handcuffs, there were no additional security officers present to raise the suggestion of Ring being a dangerous person. Clark said he had no information to suggest recent "accidental" discharges.

Clark testified that he was aware that he could have challenged the use of the stun belt; he even mentioned to a detention officer that if it went off it might mean a mistrial. As a tactical decision, he did not object. Clark reasoned that the County Attorney considered Ring an especially dangerous person; his assessment was that the alternative to the stun belt would be multiple detention/security officers who would be a more visible sign to jurors that Ring was a potentially dangerous person.

The Court does not believe that Clark's tactical decision to forego alternative security measures by the Sheriff's Department was deficient representation.

Ring said that because of a near death experience with electricity and the prospect that the stun belt might go off accidentally, he was unable to think and give clear testimony. Ring said he asked Clark to get the stun belt removed and when Clark didn't, he asked VanDreumel to get it removed. VanDreumel did not testify that Defendant asked her to seek removal of the stun belt or expressed fear from its use.

Clark testified that Ring never indicated any difficulty with the belt or difficulty concentrating. The Court found Clark's testimony more credible than Ring's testimony.

This Court finds that Defendant has failed to demonstrate ineffective assistance of counsel on this issue. ...

(Exh. G at 4-5.)

Petitioner has not demonstrated deficient performance or prejudice. Here again, Petitioner has not presented clear and convincing evidence to rebut that presumption of correctness that applies to the state court's factual findings regarding Clark's testimony about the stun belt. See 28 U.S.C. § 2254(e)(2). And, the Court must defer to the state court's credibility determinations. See Aiken, 921 F.2d at 217.

In any event, disagreements regarding trial tactics or strategy cannot form the basis for a claim of ineffective assistance of counsel. See Strickland, 466 U.S. at 690; People of Territory of Guam v. Santos, 741 F.2d 1167, 1169 (9th Cir. 1984) (stating that a "tactical decision by counsel with which the defendant disagrees cannot form the basis of a claim of ineffective assistance of counsel"). Ineffective assistance is not shown "where counsel's actions or omissions reflected tactical decisions, even if better tactics appear in retrospect to have been available." U.S. v. Stern, 519 F.2d 521, 524 (9th Cir. 1975). Here, the record reflects that there was a tactical reason for not objecting to the stun belt as Petitioner was dressed at counsel table, was not wearing handcuffs, and there were no additional security officers present to raise the suggestion of Petitioner being a dangerous person. Counsel made a tactical decision that the alternative to wearing a stun belt would be a more visible sign to jurors that Petitioner was a potentially dangerous person.

Accordingly, Petitioner has not established that the state court's determination is based on an unreasonable determination of the facts, or is contrary to, or an unreasonable application of federal law.

**6.      Trial counsel was ineffective for failing to request a second-degree murder instruction and failing to object to consecutive sentences**

Petitioner alleges that trial counsel was ineffective for failing to request a second-degree murder instruction and failing to object to consecutive sentences. The Arizona Court of Appeals found:

> ¶32 Ring was sentenced on October 29, 1997, to consecutive prison terms of twenty-one years on counts two, three, and four, and a term of 8.75 years for theft, the first twenty-one-year term to commence upon his discharge from the death sentence imposed for the murder conviction. Pursuant to an agreement Ring entered into with the state after the case was remanded for resentencing on the murder conviction, he was sentenced on July 17, 2007, to a prison term

of natural life. Clark's alleged ineffectiveness in failing to object to consecutive sentences is moot in light of the natural-life term that Ring agreed would be imposed for first-degree murder.

¶33 Furthermore, in light of Ring's defense, Ring has not shown that Clark's failure to request a second-degree murder instruction as a lesser-included offense of first-degree murder based on premeditated murder, was deficient performance or prejudicial. Rather, the record before us shows that Clark made a tactical decision. "[D]isagreements as to trial strategy or errors in trial tactics will not support an effectiveness claim so long as the challenged conduct could have some reasoned basis." *Meeker*, 143 Ariz. at 262, 693 P.2d at 917. Ring's alibi defense—that payment he received from the FBI and for work as a bounty hunter explained his excessive expenditures around the time of the robbery and the large amount of cash found in his garage—was, as he admitted in his Rule 32 petition, an "all-or-nothing defense." As the state points out in its response to the petition for review, further illustrating the lack of prejudice here, the jury found Ring guilty of murder based on felony murder, not first-degree, premeditated murder. Thus, the trial court did not err in summarily denying relief on this claim.

(Ex. B at 8, ¶¶ 32-33.)

The Court finds that Petitioner has not established deficient performance or prejudice. Petitioner again objects to what appears to be a tactical and strategic decision by counsel in presenting the "alibi defense – that payment he received from the FBI and for work as a bounty hunter explained his excessive expenditures around the time of the robbery and the large amount of cash found in his garage," versus requesting a second-degree murder instruction as a lesser-included offense of first-degree murder based on premeditated murder. Disagreements regarding trial tactics or strategy cannot form the basis for a claim of ineffective assistance of counsel. See <u>Strickland</u>, 466 U.S. at 690; <u>People of Territory of Guam</u>, 741 F.2d at 1169. In any event, as the appellate court stated, there is no prejudice as the jury found Petitioner guilty of murder based on felony murder – not first-degree, premeditated murder.

\\\
\\\
\\\
\\\
\\\
\\\

As to counsel's failure to object to consecutive sentences, again, Petitioner has not shown prejudice as the issue is mooted in light of the natural-life term that Petitioner agreed would be imposed for first-degree murder conviction. As such, Petitioner has not established that the state court's determination is based on an unreasonable determination of the facts, or is contrary to, or an unreasonable application of federal law.

## CONCLUSION

Having determined that Grounds One and Three are procedurally defaulted; (2) Grounds Two, Four, and Seven fail to state a cognizable claim; and (3) Petitioner's remaining claims fail on the merits, the Court will recommend that Petitioner's Petition for Writ of Habeas Corpus be denied and dismissed with prejudice.

**IT IS THEREFORE RECOMMENDED** that Petitioner's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be **DENIED** and **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER RECOMMENDED** that a Certificate of Appealability and leave to proceed *in forma pauperis* on appeal be **DENIED** because the dismissal of the habeas petition is justified by a plain procedural bar and jurists of reason would not find the procedural ruling debatable.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment. The parties shall have fourteen days from the date of service of a copy of this recommendation within which to file specific written objections with the Court. See 28 U.S.C. § 636(b)(1); Rules 72, 6(a), 6(b), Federal Rules of Civil Procedure. Thereafter, the parties have fourteen days within which to file a response to the objections. Pursuant to Rule 7.2, Local Rules of Civil Procedure for the United States District Court for the District of Arizona, objections to the Report and Recommendation may not exceed seventeen (17) pages in length. Failure timely to file objections to the Magistrate Judge's Report and Recommendation may result in the acceptance of the Report and Recommendation by the district court without further

review. <u>See</u> <u>United States v. Reyna-Tapia</u>, 328 F.3d 1114, 1121 (9th Cir. 2003). Failure timely to file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation. <u>See</u> Rule 72, Federal Rules of Civil Procedure.

DATED this 22nd day of January, 2018.

_Michelle H. Burns_

Michelle H. Burns
United States Magistrate Judge